485 So.2d 1071 (1986)
BLUE CROSS & Blue Shield of Mississippi, Inc.
v.
Kenneth W. LARSON, et ux.
No. 55312.
Supreme Court of Mississippi.
March 19, 1986.
Warren C. Dorsey, Jr., Jackson, for appellant.
Roland J. Mestayer, Jr., Megehee, Brown, Williams & Mestayer, Charles J. Weeks, Pascagoula, for appellees.
Before PATTERSON, C.J., and SULLIVAN and ANDERSON, JJ.
PATTERSON, Chief Justice, for the Court:
This appeal concerns the construction of insurance contract provisions. One is a Coordination Of Benefits (C.O.B.) provision in a Blue Cross & Blue Shield group policy of Moss Point Marine covering Kenneth Larson, a participating employee, and his wife, Carolyn, as his dependent. The second is an "Other Insurance" provision contained in the Pascagoula-Moss Point Bank Employee Medical Expense Reimbursement Trust (Trust) covering Carolyn as a bank employee participant.
Carolyn was an employee of the Pascagoula-Moss Point Bank which created the Trust to pay medical expenses of its employees if there was no other medical coverage. Carolyn was also protected by Blue Cross & Blue Shield as a dependent through her husband's policy as an employee of Moss Point Marine. Medical expenses of over $600.00 were incurred by Carolyn for which she unsuccessfully *1072 sought reimbursement from Blue Cross. The claim was denied because Blue Cross maintained its obligation was secondary, and that her employer's Trust was primarily liable. Accordingly, it tendered less than $200.00 (excess) to the Larsons as a secondary insurance carrier.
The original complaint for declaratory relief was filed in the County Court of Jackson County where, after submission of joint stipulations of fact, oral arguments and briefs, the court determined Blue Cross to be primarily liable and the Trust liable to Carolyn for "contingent excess liability" for her medical expenses. Blue Cross appealed this judgment to the circuit court where it was affirmed. This appeal follows.
The Blue Cross policy contains a C.O.B. provision to limit benefits for a single medical risk to not more than one hundred percent of the medical expenses. The C.O.B. is intended to avoid duplication of coverage, and thereby avoid twofold payment exceeding the actual medical expenses to a claimant. The C.O.B. provision of the Blue Cross policy follows:
This provision shall apply in determining the benefits as to a person covered under this Contract for any Claim Determination Period if, for the Covered Services incurred as to such person during such period, the sum of the benefits that would be payable under this Contract in the absence of this Provision, and the benefits that would be payable under all other Plans in the absence therein of contractual terms of similar purpose to this Provision would exceed the reasonable cost of such Covered Services.
The Bank's Trust for its employees contained a clause relating to "Other Insurance," viz:
Reimbursement under this Plan shall be made by the Trust only in the event and to the extent that such reimbursement or payment is not provided for under any other employer sponsored or labor union sponsored insurance policy or policies, regardless of whether the coverage is attributable to the employment of the spouse or a dependent of an enrolled Employee. In the event that there is such a policy or plan in effect, the Employer shall be relieved of any liability hereunder.
Coordination of benefits is a valid method to contain health care cost within reasonable limits by the prevention of duplication of payments in excess of actual medical charges. These provisions provide an orderly procedure for the determination of primary and secondary coverage responsibilities. Complexities have arisen largely because our society supports, and family economics demand, the employment of both spouses outside the family unit. The Supreme Court of Kansas in Blue Cross & Blue Shield of Kansas Inc. v. Riverside Hospital, 237 Kan. 829, 703 P.2d 1384 (1985), in recognition of the need for C.O.B. clauses stated:
In modern American society, husbands and wives frequently both work outside the home with each being covered by his or her own employee health care group plan. Family coverage, in such circumstances, sets up the potential for duplication of benefits where one or both has family coverage under a plan. Duplication of benefits accomplishes none of the goals of such plans, serving only to run up the cost of the plans. Hassles, such as the one before us, increase the costs of administration of the plans and can delay payment of the medical bills (or reimbursement to the employees who have previously paid the bills). Obviously, litigation of the dispute between plans as to coverage should be avoided wherever possible.
703 P.2d at 1388-89.
The procedures for equitably resolving the issues arising from duplicating coverage have been addressed by this Court. In Travelers Indemnity Co. v. Chappell, 246 So.2d 498 (Miss. 1971), we gave examples of three broad categories of "other insurance" clauses where the phraseology of the policies permitted. The first is a "pro rata" clause in which one company is primary but agrees to pay its prorata share with other *1073 primary insurers. The second category is the "excess" clause, which insures the loss only to the extent it is not paid by other insurance. The third category is the "escape" clause where the insurer disclaims any liability where there is other coverage. We discussed the development of these legal principles stating:
The courts had little trouble with this rule; that is to say, so long as the escape v. escape clauses, excess v. excess clauses and prorata v. prorata clauses were identical, the courts held them to be conflicting and nugatory so as to cancel each other out, and therefore liability under the two policies was prorated between the two insurance policies in the ratio of the limits of liability fixed in each policy which bears to the total limits in all of the policies covering the risk.
246 So.2d at 503.
We observed, however, that if there were conflicting clauses not within similar categories whereby one clause of a policy predominates over a somewhat similar clause of another policy, legal entanglements would likely follow. We observed:
When there was a conflict between an escape clause and an excess clause, the excess clause ordinarily would be given full effect and would not activate the liability in that policy. Likewise, where an excess clause is in conflict with either an escape clause or a prorata clause in the other policy, the excess clause ordinarily would be given full effect. The courts are thus attempting to give full effect to the intent of the two policies to offer two different levels of coverage. 246 So.2d at 503.
Our interpretation of the C.O.B. provision of Blue Cross encompasses not only its language to achieve the prevention of over-payment of claims; but necessarily entails other considerations in resolving, or attempting to, the procedural steps necessary to the resolution of primary and secondary coverage. One such fact employed in the resolution is the status of the protected employee; i.e., whether a subscribing beneficiary of his employer's protection plan, or whether the claimant is a dependent beneficiary of the subscribing beneficiary, but who is also a primary beneficiary of another program of a different employer. In this circumstance the dependent claimant, by ordinary C.O.B. agreements, would be required to seek primary medical benefit payments from the insurer to whose services he or she subscribes. By this method of determining primary and secondary liability coverage, the claimant's status as a designated beneficiary in coverage provided by a spouse is largely overlooked. By invoking this procedure the liability of Blue Cross in this case is secondary simply because the claimant enjoys or is burdened by the protection plan of her own employer.
Although this expedient procedure undoubtedly has admirable persuasions to support it such as simplicity and the avoidance of litigation with its cost, it overlooks and erodes the privileged right of the several parties to contract, assuming such is not against public policy, by expressing their intentions through the language of their choice. Other well intended devices such as primary and secondary liability being established according to the time in which coverage was attained, in our opinion, detract from the language expressing the intentions of the insurer and the insured.
It is our opinion the issue now before us can best be determined by resolving the protection intended to be afforded by Blue Cross and that intended by the Trust as expressed in their contracts without employment of devices to expedite contractual interpretation.
In Blue Cross & Blue Shield of Kansas, Inc. v. Riverside Hospital, supra, the court considered two employee health care benefit plans to determine which plan had primary coverage of the claim. This issue was resolved in favor of Blue Cross because of the language of the policies. The Kansas Court explained:
... As a dependent of Gregory Stadalman under his Blue Cross-Blue Shield family plan, Leslie Stadalman has Blue Cross-Blue Shield coverage that is only *1074 excess (secondary) in nature. Her own group plan is primary unless another group plan provides primary coverage. The Blue Cross-Blue Shield plan does not provide primary coverage to Mrs. Stadalman by virtue of the fact she is a covered employee in her own group plan. Therefore, there is no potentiality for duplication of benefits or overpayment.
703 P.2d at 1390.
Relying on Northeast Dept. ILGWU v. Teamsters Local U. No. 229, 764 F.2d 147 (3rd Cir.1985), the Kansas Court remanded the cause by stating:
The general common law rule is that "the liability of insurers under overlapping coverage policies is to be governed by the intent of the insurers as manifested by the terms of the policies which they have issued." 16 Couch on Insurance 2d § 62:44, at 480 (rev'd ed. 1983). "[W]here such contractual provisions are not inconsistent with public policy, they will be enforced." 8A Appleman, Insurance Law and Practice § 4907.65, at 367. Under state common law, then, "the judicial task is first to determine from the contracts themselves what obligations the respective obligors intended to assume and then to determine whether these intentions are compatible not only each with the other but also with the insured's rights and expectations and with the controlling demands of public policy." Starks [v. Hospital Service Plan of N.J., Inc.], 182 N.J. Super. [342] at 351, 440 A.2d [1353] at 1358 [1981]. We believe that this mode of analysis is fundamentally sound. In the ERISA context, courts should give effect to the intent of the trustees of the competing benefit plans, as evidenced by the incorporation of "other insurance" provisions, if the provisions are compatible, unless doing so results in the enforcement of a provision that conflicts with the provisions and policies of ERISA.
764 F.2d at 159.
703 P.2d at 1390-91.
We do not have the same language under consideration in this case.
In Starks v. Hospital Service Plan of N.J., Inc., 182 N.J. Super. 342, 440 A.2d 1353, 25 A.L.R. 4th 1022 (1981), the New Jersey Court held against Blue Cross-Blue Shield because the overall objective of the two policies revealed one policy had primary coverage and the other had only a provision for excess coverage in the event there was primary coverage for the claimant emanating from another policy source. This is to say the claimant's policy never intended to provide primary coverage where another policy existed containing primary coverage for the spouse of the primary beneficiary, but was only secondary or excess coverage if a spouse was protected by the provisions of another policy. In other words, we do not think the C.O.B. provision of Blue Cross and the "Other Insurance" expression in the Trust are compatible to a construction permitting a plan against which the benefits of the two policies could be coordinated.
This appears to be the precise situation now before us. We find Starks, supra, to be precisely on point and because this is so, we quote from it somewhat extensively.
The controversy here arises from the fact that the individual plaintiffs are all direct beneficiaries of the Welfare Fund Plan and each is also the spouse and hence a dependent of a direct subscriber under a Blue Cross/Blue Shield employer group contract. The question then is whether the Welfare Fund Plan is a program against which Blue Cross/Blue Shield is entitled to coordinate benefits, thereby converting its primary responsibility into a secondary or excess one.
* * * * * *
In our judgment the Welfare Fund Plan only intended to be obligated to make payments to its members for reimbursement of medical and hospital expenses to the extent that the cost of those services was not covered by any other source of payment, including employer group contracts such as those issued by Blue Cross/Blue Shield covering its members as dependents of direct subscribers. Its *1075 intention thus was to serve as a payment source of absolutely last resort... .
We start with the premise that the coordination of benefits device and group contracts is perfectly valid and enforceable so long as its operation does not impinge upon a beneficiary's right to an expectation of full coverage but rather is employed only to prevent double recovery and thereby to reduce premiums. (Citations omitted.) To this extent the coordination of benefits provision performs the same function as all other-insurance provisions, namely, to permit insurance carriers to "decide among themselves which is to bear the incidents of a single loss, or whether it is to be shared and in what proportion," (Citation omitted). The problem here involved is thus the typical one which is raised when a single loss is covered by more than one contract, each of the contracts contains some variation of an other-insurance clause, and the obligors cannot agree on their respective obligations to the end that the loss is fully covered. In dealing with such problems the judicial task is first to determine from the contracts themselves what obligations the respective obligors intended to assume and then to determine whether these intentions are compatible not only each with the other but also with the insured's rights and expectations and with the controlling demands of public policy.
* * * * * *
In applying these principles here, it is first evident that in the circumstances before us the Blue Cross/Blue Shield coverage is intended to be primary as to its subscribers and excess as to dependents of subscribers who are direct beneficiaries of other delimited plans. Its intention as to these plaintiffs was apparently, therefore, to provide only excess coverage. It is also evident that the Welfare Fund Plan is not intended to be primary in any circumstances ... . it is ... the precise nature and purpose of the offered benefits as compared with the precise nature and purpose of those offered by Blue Cross/Blue Shield, which determine whether it constitutes a plan against which Blue Cross/Blue Shield is entitled to coordinate against. We are further persuaded that these considerations preclude such coordination here.
* * * * * *
If the provisions of the two plans here were mutually repugnant, we would unhesitatingly apply the Cosmopolitan rule and hold that as to these plaintiffs, Blue Cross/Blue Shield and the Welfare Fund Plan would be obliged to share the payment of benefits pro rata. We do not do so, however, because in our view a comparison of the two operative other-insurance clauses makes it clear that they do not support the predicate of mutual repugnancy. That predicate, as we view it, is the existence in each of the clauses of language which establishes precisely the same order of payment for each coverage. If there is, however, in either but not both of the clauses a clearly expressed intention of the undertaking of an obligation prior to or subsequent to the other, that intention will ordinarily be enforced by the courts.
Indeed, such expressed intentions constitute the basis of enforcement of the customary excess or secondary payment clause vis-a-vis primary undertaking where the insured is entitled to a single recovery only. (Citations omitted.)
Where the two coverages are not, however, primary and secondary but rather secondary and tertiary, there being no primary coverage in the usual sense, the only rational result is to require the secondary coverage to pay first and the tertiary coverage to pay second. The concept of tertiary coverage, that is, coverage which is intended as excess to ordinary excess coverage is, moreover, not a novel one in insurance usage... . We are persuaded that the Welfare Fund Plan here constitutes just such contingent excess coverage and that this intention could hardly have been more plainly spelled out.

* * * * * *

*1076 ... [T]he consequence of COB provisions is that instead of all primary obligors contributing a portion of payment of each single claim, the risk is shared by the technique of predesignating, by specific criteria, which, among the primary obligors, pays all of a particular single claim up to its own maximum coverage... .
... [T]he Blue Cross/Blue Shield COB provision is not reasonably construable as having intended that a contingent resource such as that offered by the Welfare Fund Plan would constitute a plan against which its benefits would be coordinated. (Emphasis added.)
440 A.2d at 1356-61.
For the foregoing reasons we are of the opinion the trial court and the circuit court on appeal reached the proper result in the resolution of the issue before them.
We also hold that Blue Cross & Blue Shield is primarily liable to Carolyn Larson for her medical expenses and the Bank Trust is liable only for "Contingent Excess Liability." The judgment of the circuit court on appeal is affirmed.
AFFIRMED.
WALKER and ROY NOBLE LEE, P.JJ., and HAWKINS, DAN M. LEE, PRATHER, ROBERTSON, SULLIVAN and ANDERSON, JJ., concur.